COLUMBIA DISTILLING COMPANY, Appellant, *v.* THE STATE OF NEW YORK, Respondent.

Third Department, May 8, 1918.

**Waters and watercourses — easement in watercourse — nonuser — abandonment — laches — easements in lower Bear race, village of Waterloo, extinguished by abandonment, adverse user or laches — appropriation by State of race for canal purposes — failure to assert rights before Court of Claims.**

Nonuser alone of an easement created by grant does not make an abandonment of it; there must be more than a nonuser.

Any easements which a water power owner in the village of Waterloo had in lower Bear race, which was originally a channel carrying water to a mill and was in use for more than one hundred years, was lost when the use was destroyed thirty-seven years ago by the appropriation thereof by others without objection by such owner who knew all the facts.

Thus, when lower Bear race fell into disuse in 1879 and the waters were cut off therefrom by the erection of a bulkhead in that year, which bulkhead was replaced by another bulkhead when the State in 1892 dredged the race and made it part of the State canal system under the authority of chapter 325 of the Laws of 1888 and chapter 461 of the Laws of 1889, a millowner who took no objection to such appropriation of the race and who never presented for adjustment in the Court of Claims any claim for rights destroyed within the time required by law, must be deemed to have abandoned and to have lost any easement in said race, or to have lost the same by adverse user.

No rights of said millowner were revived by the subsequent action of the State in relation to the race in the year 1913 in connection with its canal system, for such water rights had already been lost by the prior appropriation thereof.

Under the circumstances, the claimant must be held to have slept upon his rights for such length of time that the court will not question the rights of the parties who have had full use of the water rights for such period.

As the State officials in constructing the canal are presumed to have done their duty, they are presumed to have obtained the releases from the parties interested in the water power of the old Bear race, and the court will assume either that they obtained a release from the present plaintiff or that it claimed no right.

COCHRANE and WOODWARD, JJ., dissented, with opinion.

APPEAL by the plaintiff, Columbia Distilling Company, from a judgment of the Court of Claims, entered in the office of the clerk of said court on the 28th day of December, 1917, dismissing the claim herein on the merits.

*Duffy & McLean* [*George P. Decker* of counsel], for the appellant.

*Merton E. Lewis, Attorney-General* [*Edward J. Mone, Deputy Attorney-General*, of counsel], for the respondent.

JOHN M. KELLOGG, P. J.:

Nonuser alone, of an easement created by grant, does not make an abandonment of it, but here there is more than a nonuser. The rights now claimed by plaintiff were actually destroyed thirty-seven years ago by the appropriation thereof by others without objection by the plaintiff who knew all the facts.

Lower Bear race, which we are interested in, was a channel carrying water to a mill, and was in use more than one hundred years ago. The mill fell into disuse and decay, and disappeared prior to 1879, and the race fell into disuse, its walls fell in, and in that year a bulkhead was built across it, above Washington street, preventing the water from flowing into the race below. Below Washington street a culvert crossed under the race, carrying the surface waters into Meadow creek, and about that time, and when the walls of the race were caving in, the top of the culvert fell in, with the result that any water leaking through the bulkhead into the race was discharged through the culvert into Meadow creek, so that since 1879 there was no water flowing through the lower Bear race, where we are interested in it, except surface water accumulating in the depression which was formerly the race. In the early history of the stone bulkhead, in high water, the water at times flowed over it into the race; but apparently the mills above it required more water, with the result that by planking and other means the bulkhead was raised and thereafter no water escaped except such as leaked through it. We, therefore, find that in 1879 the mills which the race was intended to supply with water had ceased to exist, the race which carried the water had disappeared, and a permanent bulkhead had been built by others for their benefit above Washington street which would have prevented any water from flowing into the race if it were in existence. These conditions continued until the building of the second bulkhead, which we are now to consider.

Chapter 325 of the Laws of 1888 and chapter 461 of the Laws of 1889 provided for the dredging and excavating of the old Bear race down to Washington street, provided the owners of the land should release to the State the use of the race for canal purposes only, subject to all their other rights in the water power, and the said channel, so excavated, became a part of the canal system of the State. Much litigation followed. Other water-power owners at Waterloo, who took water from the canal, contended that the legislation was invalid, and in the interest of the water-power owners in this race and not for the public benefit. The legislation, however, was sustained in *Waterloo Woolen Mfg. Co.* v. *Shanahan* (128 N. Y. 345) in 1891. That action was brought to restrain the contractor from proceeding with the work, and shortly after the decision, probably in 1892, the race was dredged and excavated to Washington street and the old bulkhead taken out and a new one built below the bridge at Washington street. The dredging was to give a greater depth of water above Washington street for the navigation of boats, and only the State and the water-power owners above the street were interested in having the level of water maintained at that place. The court found that the first bulkhead was removed and the second bulkhead constructed either by the State or other interested parties. No parties could be interested except the State and the millowners above the street. The State could not dredge and excavate the canal to Washington street without removing the first bulkhead and having removed it for the purpose of making the water navigable for boats, it was necessary for the State to have a bulkhead erected to maintain the proper water level for navigation. We, therefore, find that the State removed the first bulkhead. Having removed the first bulkhead, it was its interest, and its duty towards the water-power owners, to replace it by a permanent structure to retain the waters for the canal system of the State. We, therefore, find that the second bulkhead was constructed by the State. That bulkhead was an absolute and permanent destruction by the State of Bear race below the bulkhead, if any vestige of it were in existence at the time. The State could not, after having removed the bulkhead belonging to the property

owners, expect them to replace it, and as the race became a part of the canal system of the State, it could not allow the property owners to build and maintain a bulkhead upon which depended the navigation of a part of its canal system. The policy of the State is to build, own and maintain its own public works. If the plaintiff's rights have been injured by the State, the injury was caused by it in 1892, if such rights were existing at that time. Any remedy plaintiff had for the destruction of its rights then arose, and should have been presented to and adjusted in the Court of Claims within the time required by law. The action of the State in 1913 in no way destroyed or interfered with any right which the plaintiff then had, and the claimant cannot seize upon that act to relieve itself from the lapse of time which was a fatal bar to any claim against the State for interfering with its water rights. It was just as impossible for the plaintiff to have any use of the alleged water rights after 1892 as it was after 1913.

The plaintiff claims a right in the race by a conveyance to it in 1886. Each bulkhead was built and maintained either with the consent and acquiescence of the plaintiff and its predecessors in title, or as a hostile and adverse act. There is no suggestion that the plaintiff, or its predecessor, leased a right to build and maintain the bulkheads. The building and maintaining of the bulkheads was so destructive to all rights in the race below that silence upon the part of the lower owners implied an abandonment of their rights. If the bulkheads were built in hostility to the rights of the plaintiff and its predecessor, an adverse holding would result. (*Woodruff* v. *Paddock,* 130 N. Y. 618.)

We are interested in the question whether the plaintiff, under all the circumstances, intended to abandon its rights in the race below Washington street. The law favors repose of titles and possessions. The Statute of Limitations does not rest upon the theory of depriving a person of his rights after a certain lapse of time, but upon the probability that after such lapse of time parties and witnesses to the transaction may be dead or absent; documents may be lost, or material facts forgotten, and that after such long acquiescence in the use of property there is a reasonable inference that

the use was justified by the facts, if the dimness of time did not obscure the view. A grant is often presumed. Where a party, after thirty-seven years, wakes up and asserts a right which he has neglected to assert during that time as to parties who to his knowledge were enjoying the rights in apparent hostility to him, it is a fair inference that he is relying not so much upon the merits and justice of his claim as upon the hope that the essential evidence against him may be lost. Plaintiff's rights " have been permitted to sleep so long that they should know no waking." (*Matter of Bank of Sing Sing*, 32 Hun, 462; affd., 96 N. Y. 672.) After the plaintiff's long sleep, it cannot be surprised if reasonable inferences are drawn against it from its silence; that the court shall be no more solicitous to discover its rights than it has been to give them timely assertion. The facts called upon it to take some action and to assert its rights. Its claim is stale and doubtful, and the court should not now question the rights of the parties who have been in full use of the water rights for so long a time. If the plaintiff gave any license to use the water inconsistent with the idea that it had abandoned its rights, it alone is in a position to prove the facts and to disclose facts showing its real intention during all the time in question. It should not leave the court to draw inferences as to its intentions. Not having proved the facts or explained its silence, or shown its ignorance of what was taking place, or disclosed its real intention with respect to the alleged water rights, the court must apply to it the ordinary presumptions usually applied to human action. The plaintiff, apparently a water-power owner in the village, must have known of the legislation referred to and of the lawsuit involving the substantial rights of the property owners in the village. The State officials are presumed to have done their duty, and are presumed to have obtained the release of all parties interested in the water power of the old Bear race, and we may assume that they either obtained the plaintiff's release or that the plaintiff claimed no right. The fact that the plaintiff made no claim under the act is pretty good evidence that none of its rights were injured by the permanent destruction of the race below the street.

It is manifest that the plaintiff has no just claim against

the State. It had lost its right by adverse possession or by abandonment. I favor an affirmance of the judgment, with costs.

All concurred, except COCHRANE, J., dissenting, with opinion, in which WOODWARD, J., concurred.

COCHRANE, J. (dissenting):

Claimant is the owner of premises in the village of Waterloo near the outlet of Bear race, and in connection with said premises has title by grant to take from said race "sufficient water * * * to make and be equivalent to two full runs of stone." In the year 1913 the State appropriated for canal purposes a portion of Bear race a short distance east of Washington street, and erected on the land so appropriated a structure which made it practically impossible for water to flow through the race to claimant's property. For such appropriation and interference with the claimant's easement in Bear race this claim is made. It has been dismissed on the ground of abandonment by the owner of the easement.

It does not appear who was the owner of the servient estate thus appropriated. The finding of the court is that "title to this parcel was outstanding in third parties." The State by its appropriation has succeeded to the rights of those third parties and the question for determination, therefore, is whether as between them and claimant the latter has lost by abandonment its easement in Bear race which existed by grant.

Bear race extends from a point in the Seneca river for a considerable distance thruogh the village, and discharges into a lower level of the river. It was constructed more than a hundred years ago by Samuel Bear who then owned all of the land through which it extends. This land was subsequently subdivided and the water of the race was used to furnish power to different mills along the same. Prior to the year 1879, there existed on the premises of the claimant one or more mills operated by hydraulic power from the race. In that year those mills fell into dilapidation and disappeared and since that time no use whatever so far as the evidence discloses has been made of the premises in question. Between the years 1879 and 1883 a stone bulkhead was built across

Bear race above and west of Washington street.   There is no
evidence as to who built it or the circumstances or conditions
under which it was constructed.   Chapter 325 of the Laws of
1888 and  chapter 461 of  the Laws of  1889 authorized the
Superintendent  of  Public  Works  to  dredge  and  excavate
Seneca river and " the old Bear Race " to Washington street
so as to admit the passage of canal boats therein " subject,
however, to all the other rights of owners of water and water-
power in said race, and said channel shall thereafter be a
public highway for the purposes of navigation only."   Pur-
suant to this legislation the State in 1890 improved the upper
end of Bear race west of Washington street  by widening and
deepening the same.   The old bulkhead was removed and in
its place was constructed a new bulkhead immediately east of
Washington street, but west of the appropriation of 1913.
The legislation did not authorize the State to construct any
bulkheads and there is no evidence or finding that the State
did make any such construction.   The finding of the court is
" that at or about the time of the said improvements either
the State or other interested parties removed the said bulk-
heads and constructed in place thereof new bulkheads in the
Bear Race just below (east of) Washington Street."   The
effect of these bulkheads was to prevent the flow of practically
all water below the same and to increase the volume of water
above the same, which increased volume has been enjoyed
and used by the owners of the water rights and privileges at
the upper end of the race above the bulkheads.

Abandonment is primarily and essentially a question
of intention.  " Intention is the first and paramount object
of inquiry; for there can be no abandonment without the
intention to abandon.  * * *  There must be a clear,
unequivocal, and decisive act of the party to constitute
abandonment in respect of a right secured — an act done which
shows a determination in the individual not to have a benefit
which is designed for him."   (1 C. J. 7.)

So in *Hennessy* v. *Murdock* (137 N. Y. 317, 326) it was
said:  " They [the authorities] are all to the effect that where
an abandonment of an easement is relied upon, there must be
clear and convincing proof of an intention in the owner to
abandon it as such."

In *Snell* v. *Levitt* (110 N. Y. 595) there was the most unequivocal evidence of an abandonment, viz., among other things an agreement to release the easement for an actual consideration paid, which agreement was acted upon for more than twenty years, and the creation of a new easement in place of the other.

We think the evidence falls short of showing clearly and decisively an intention on the part of the owner of the easement to abandon the same. The main circumstance relied on by the respondent is the construction of the bulkheads, and the consequent obstruction of the water for a long period of time. The lapse of time, however, is explained by the fact that the owner has had no occasion to make use of the water since the disappearance of the mills in 1879. (*Welsh* v. *Taylor*, 134 N. Y. 450, 458; *Hennessy* v. *Murdock*, 137 id. 317, 325.) As stated there is no evidence showing a single fact as to how or why or by whom either bulkhead was constructed except as it may be inferred that such construction was for the purpose of increasing the water power for the benefit of the millowners at the upper end of the race after the disappearance of the mills below. One Tracy was the owner of the easement when the first bulkhead was constructed and it is not even shown that he had knowledge of its construction. In 1886 he conveyed the premises to the claimant, granting in specific terms the easement in question, indicating thereby a clear lack of intention on his part to abandon the same. There is no evidence connecting either Tracy or the present owner of the easement or the owners of the servient estate in the slightest degree with the construction of those bulkheads. It may be that they were constructed under an arrangement whereby the water would eventually revert to the owners of the easement or that it would be restored when desired. The owner of the easement may have been entirely willing to permit the appropriation of water as long as such owner had no use for it, but it does not follow that either the servient owners or the State has thereby acquired a permanent right to use the same. It may be that the construction of the bulkheads constituted a trespass or an invasion of the rights of the owner of the easement. The evidence throws no light on the subject. There is no evidence or claim of adverse possession. There is

no element of estoppel. No one interested in the servient estate would be unjustly affected if the exercise of the easement should be resumed so as to give force to the claim of abandonment. (*Snell* v. *Levitt*, 110 N. Y. 595; *White* v. *Manhattan Railway Company*, 139 id. 19.) If the servient owners were asserting an abandonment of this easement the mere fact that some third party had obstructed and appropriated the water during a period when the dominant owner had no occasion to use the same, without any evidence as to the circumstances or occasion of such appropriation, or by what authority, contract or arrangement it was accomplished would not sustain such claim by the servient owners especially when as here neither the servient nor the dominant owner is connected with the acts of such third party, and the State stands in no better position, having succeeded only to the rights of the servient owners.

It furthermore appears from the evidence introduced by the State itself that the premises in question, including the easement, are worth $2,300, whereas without the easement they are worth only $500, and in order to sustain this claim of abandonment it is, therefore, necessary to assume that the owner of the premises voluntarily intended to abandon an easement which gave to the property nearly all its value. It is true this evidence relates to the year 1913, and not to the time when the abandonment is claimed to have been made, but still the inference seems reasonable that even at that time the easement must have constituted a large proportion of the value of the property.

The claimant establishing a title by grant, the burden of destroying it rests upon the State. (1 R. C. L. "Abandonment," § 12; 1 C. J. 11; *Hennessy* v. *Murdock*, 137 N. Y. 317, 325.) This burden has not been sustained by evidence sufficiently clear and convincing. The responsibility for any failure of proof rests with the State.

The judgment should be reversed and a new trial granted, with costs to the appellant to abide the event.

WOODWARD, J., concurred.

Judgment affirmed, with costs.